[Cite as *State v. Peters*, 2018-Ohio-1684.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## VAN WERT COUNTY

STATE OF OHIO,

     PLAINTIFF-APPELLEE,               CASE NO.  15-17-13

     v.

CHRISTOPHER M. PETERS,           O P I N I O N

     DEFENDANT-APPELLANT.

Appeal from Van Wert County Common Pleas Court
Trial Court No. CR-16-11-116

**Judgment Affirmed**

Date of Decision:   April 30, 2018

**APPEARANCES:**

    *Michael J. Short* **for Appellant**

    *Kelly J. Rauch* **for Appellee**

**SHAW, J.**

{¶1} Defendant-appellant, Christopher Peters ("Peters"), brings this appeal from the October 23, 2017, judgment of the Van Wert County Common Pleas Court sentencing him to serve life in prison without parole after Peters was convicted by a jury of Aggravated Murder in violation of R.C. 2903.01(C), an unspecified felony, Felonious Assault in violation of R.C. 2903.11(A)(1), a second degree felony, and Endangering Children in violation of R.C. 2919.22(B)(1)/(E)(1)(d), a second degree felony. On appeal, Peters argues that his convictions were against the manifest weight of the evidence and that the trial court erred by failing to merge the Aggravated Murder conviction with the Felonious Assault conviction for purposes of sentencing.

*Relevant Facts and Procedural History*

{¶2} On November 28, 2016, Peters was indicted for Aggravated Murder in violation of R.C. 2903.01(C), an unspecified felony, Murder in violation of R.C. 2903.02(A), an unspecified felony, Felonious Assault in violation of R.C. 2903.11(A)(1), a felony of the second degree, and Endangering Children in violation of R.C. 2919.22(B)(1), a felony of the second degree. The Aggravated Murder charge carried a death penalty specification, but that specification was later

dismissed.[1]  The charge of Murder in violation of R.C. 2903.02(A) was also later dismissed.  The charges essentially alleged that Peters beat 15-month old H.R. to death.  H.R. was the son of Peters' girlfriend, Valarie Dean.  Peters pled not guilty to the charges.

{¶3} Peters' case proceeded to a jury trial, which was held September 18, 2017, to September 22, 2017.  At trial, the State called 15 witnesses and introduced over 65 exhibits then rested its case.  Amongst the evidence introduced was a coroner's report indicating that H.R. died of blunt force injuries to the chest and abdomen due to a beating.  Evidence presented also indicated that Peters was taking care of H.R. while Valarie was at work during the time of the likely cause of death.  Other circumstantial evidence was introduced, linking Peters to the crime, including a statement Peters made to another inmate saying he should just go to court and ask for the death penalty because he could not live with what he had done.

{¶4} Peters called three witnesses on his own behalf and introduced a number of exhibits into evidence.  His defense focused largely on H.R. having a "toxic" level of Benadryl in his system, which he contended caused H.R.'s death.  He also pointed to Valarie Dean's failings as a mother, and her opportunity alone with H.R. wherein she could have caused H.R.'s death.  Nevertheless, Peters argued that even

---

[1] The defense filed in excess of 90 pretrial motions in this case, many of which dealt with matters related to the death penalty.  As there are no assignments of error dealing with pretrial matters, we will not address them.

if H.R. did die of a beating, there were no witnesses establishing that it was Peters who had done the beating and there was no direct evidence of his involvement.

{¶5} After the evidence was presented, the jury was given instructions, which included requested instructions on the lesser-included offenses of Murder and Involuntary Manslaughter for the Aggravated Murder charge. However, the jury found Peters guilty of all three counts in the indictment: Aggravated Murder, Felonious Assault, and Endangering Children.

{¶6} On October 23, 2017, Peters' case proceeded to sentencing. Peters was ordered to serve life in prison without parole on the Aggravated Murder conviction, 8 years in prison on the Felonious Assault conviction, and 8 years in prison on the Endangering Children conviction. The trial court found that none of the sentences merged and then ordered all of the prison terms to be served consecutively. A judgment entry memorializing Peters' sentence was filed October 23, 2017. It is from this judgment that Peters appeals, asserting the following assignments of error for our review.

**Assignment of Error No. 1**
**The convictions are against the manifest weight of the evidence.**

**Assignment of Error No. 2**
**The trial court erred in failing to merge the aggravated murder and felonious assault charges for sentencing.**

*First Assignment of Error*

**{¶7}** In Peters' first assignment of error he argues that his convictions were against the manifest weight of the evidence. Specifically, he contends that there was a period of time wherein Valarie Dean, H.R.'s mother, was alone with H.R. and that she could have beaten H.R. or administered a lethal dose of Benadryl to him. Peters argues that there were no witnesses testifying that he did anything to H.R. and that all evidence presented was circumstantial. Peters contends that the State's case did not amount to proof beyond a reasonable doubt.

Standard of Review

**{¶8}** In reviewing whether a defendant's conviction was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387.

**{¶9}** Courts have held that judgments should be reversed as against the manifest weight of the evidence " 'only in the exceptional case in which the evidence *weighs heavily against the conviction*.' " (Emphasis added.) *Id*. quoting

*State v. Martin*, 20 Ohio App.3d 172, 175 (1983). Furthermore, "[t]o reverse a judgment of a trial court on the weight of the evidence, when the judgment results from a trial by jury, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required." *Thompkins* at paragraph 4 of the syllabus; Ohio Constitution, Article IV, Section (B)(3).

## Relevant Statutes

{¶10} In this case Peters was convicted of Aggravated Murder in violation of R.C. 2903.01(C), Felonious Assault in violation of R.C. 2903.11(A)(1) and Endangering Children in violation of R.C. 2919.22(B)(1). Aggravated Murder, in violation of R.C. 2903.01(C), reads, "No person shall purposely cause the death of another who is under thirteen years of age at the time of the commission of the offense."

{¶11} Felonious Assault, in violation of R.C. 2903.11(A)(1), reads, "No person shall knowingly * * * [c]ause serious physical harm to another[.]"

{¶12} Child Endangering in violation of R.C. 2919.22(B)(1) reads, "No person shall do any of the following to a child under eighteen years of age * * * (1) Abuse the child[.]"

## Evidence Presented at Trial

{¶13} Testimony at trial established that Peters, his girlfriend Valarie Dean, and Valarie Dean's 15-month old child H.R. lived in an apartment at the Old Lincoln

Inn in the city of Delphos, Van Wert County, Ohio. The residence was formerly a motel but had been converted to apartment units.

{¶14} On November 14, 2016, Valarie left the residence at around 8:30 p.m. to go to her job at Whirlpool in Findlay, Ohio. Peters remained at the residence with the intention of caring for H.R., who had a cold. Peters was not otherwise employed at that time.

{¶15} Valarie clocked in at work at 9:54 p.m., and she intended to return home after her shift. Peters had told Valarie that he had to help a friend, "George," move materials in the morning near the end of her shift, so he was going to have to leave slightly before Valarie got home.[2] Thus the plan was to leave H.R. alone at the residence, but for a short time. Peters indicated he would try to be home before noon on November 15, 2016 to be with Valarie and H.R.

{¶16} During Valarie's shift at Whirlpool on November 14, 2016, she exchanged some text messages with Peters. She notified him when she arrived at work and she asked about H.R. Peters responded saying that H.R. still seemed sick and that if he did not get better maybe he should be taken to a doctor. Valarie and Peters exchanged a number of other texts until just after midnight when Peters stated that he was going to "lay down for an hr [sic] or two" and that he would text Valarie when he woke up.

---

[2] Peters would later state in his interview that he did not have to help George and hung out with a friend instead.

{¶17} Shortly after 6 a.m. Peters indicated that he had awakened and he began texting with Valarie again. Near 7 a.m., Valarie notified Peters that she was on her way home from work but she had to stop at Walmart to use the bathroom. Surveillance video from Walmart did indicate that Valarie stopped there. Valarie messaged Peters that she was home just before 8 a.m. on November 15, 2016. Peters was not at the residence at that time and he did not indicate in the text messages what time he had left.

{¶18} After returning home, Valarie exchanged a number of messages with Peters wherein Peters expressed his worry about H.R.'s sickness, indicating that they should perhaps take him to the doctor. Valarie indicated that when she returned home from work she looked briefly in on H.R., thought he was sleeping in his crib, and that she then went to sleep herself.[3]

{¶19} Valarie awakened shortly before noon on November 15, 2016, surprised that H.R. had not made any noise. She then went to check on him and found him cold and not breathing in his crib. She called 9-1-1 and that call was played for the jury.

{¶20} Authorities responded to the scene, found Valarie screaming hysterically and determined that H.R. was dead.[4] One of the individuals called to

---

[3] Valarie did not testify at trial. Her statements were relayed through various law enforcement personnel who spoke with her at the scene.
[4] Valarie's reaction to her son's death was questioned at trial as to its authenticity.

the scene, Doctor Scott Jarvis, the Van Wert County Coroner, briefly examined H.R.'s body and filled out the death certificate. Doctor Jarvis listed the time of death as 12:20 p.m. on November 15, 2016, which was the time of identification of death, but he noted that the state of the body indicated that H.R. had been dead probably longer than 6 or 7 hours but shorter than 24. Due to a number of factors in his cursory exam of H.R., Dr. Jarvis ordered an autopsy.

{¶21} Dr. Diane Scala-Barnett performed the autopsy of H.R. She noted a number of bruises on H.R.'s abdomen, his sides, his back, and his ribs. She indicated that there was bruising in a semi-circular pattern often seen from knuckles and fists, with an accompanying abrasion that she felt was most likely from a ring. In her opinion, Dr. Scala-Barnett testified that H.R. was struck twice with a fist in that area.

{¶22} Dr. Scala-Barnett noted a number of internal injuries on H.R., which included multiple rib fractures on H.R.'s left side. Some fractures were "acute" meaning contemporaneous with the time of death, and other fractures were healing and showed existing callouses, illustrating repeated fracturing. Dr. Scala-Barnett also noted that H.R. had collapsed lungs, a hematoma on the ascending aorta, and contusion hemorrhages involving the right atrium, right ventricle, and the posterior surface of the thymus gland. Dr. Scala-Barnett found that the "left hemidiaphragm is lacerated posteriorly," that the soft tissue around the kidney and adrenal gland

was torn, and that there was a hematoma on the left lobe of the liver. (State's Ex. 70). Dr. Scala-Barnett testified that the kidney was pushed up through the diaphragm. Further, Dr. Scala-Barnett testified that there was evidence of H.R. breathing under pressure and that the combination of respiratory injuries caused respiratory failure.

{¶23} Dr. Scala-Barnett's report was introduced into evidence containing her findings. She ultimately concluded that H.R. died from "Blunt force injuries of the chest and abdomen" due to a beating. (*Id*.) She testified that the injuries were reminiscent of a high speed motor vehicle accident when a seatbelt would retract on a child. The manner of H.R.'s death was considered a homicide. In her testimony she estimated that H.R. had been dead 12-18 hours before being pronounced dead at the scene.

{¶24} During the autopsy, Dr. Scala-Barnett did extract a blood sample from H.R.'s head. That blood sample was sent to a toxicologist and the sample showed that H.R. had a "toxic" level of "diphenhydramine," or Benadryl, in his blood. Dr. Scala-Barnett testified that the diphenhydramine contributed to H.R.'s death, but the actual cause of death were the wounds from the beating, which were lethal with or without the diphenhydramine.

{¶25} A toxicologist, Dr. Robert Forney, testified on behalf of the State that a "toxic" level of diphenhydramine meant *potentially* harmful, whereas a "lethal"

level would mean deadly. Dr. Forney testified that a "toxic" level of a substance consisted of a range. For example, he indicated that inebriation is a "toxic" level of alcohol but that was very different from a "lethal" level of alcohol. He testified that while the amount of diphenhydramine in H.R.'s system was enough to be considered "toxic," it was not a "lethal" amount. According to a reference book cited at trial, Dr. Forney indicated that the level of diphenhydramine in H.R.'s blood was approximately $1/32^{nd}$ the amount of a "lethal dose."

{¶26} An opened bottle of children's Benadryl for ages 6-11 and small medicine droppers were found at the residence and the bottle of Benadryl was nearly full. Dr. Forney testified that the small amount missing from the nearly full bottle would likely be consistent with the amount of diphenhydramine in H.R.'s blood. Dr. Forney testified to a reasonable degree of scientific certainty that the amount of diphenhydramine in H.R.'s blood was not at a "lethal" level.

{¶27} Peters was notified of H.R.'s death shortly after the authorities arrived at the residence on November 15, 2016. The landlord called Peters and informed him. Peters did not come forward to speak with the authorities despite their desire to talk to him. He was eventually located with the help of the US Marshals. The record indicates that Peters and Valarie were in contact and that they were staying at Peters' mother's residence until Peters was found.

{¶28} The State introduced an interview with Peters into evidence. During the interview Peters indicated that although H.R. had fallen with a sweeper while he was watching him on the November 14, 2016, Peters did not know how H.R. had sustained such severe injuries.[5] Peters indicated that he had grabbed H.R. at one point and H.R. screamed like his arm had fallen off but Peters claimed he had not even squeezed H.R. at that time. Peters stated that H.R. had not fractured any ribs before as far as he knew. Peters further stated that he did not leave the residence until approximately 20 minutes before Valarie got home from work, and that he had not left during the night at all.

{¶29} Peters indicated that although the police officers had been trying to contact him since H.R.'s body was found, he did not come speak with them until he was detained because he had an unrelated active warrant.

{¶30} The State presented the testimony of Peters' neighbors, which contradicted some of the statements Peters made in his interview and provided circumstantial evidence of his culpability. Andrew Cavanaugh testified that he lived next door to Peters at the time of the alleged incident. He testified that in the late evening hours of November 14, 2016, he was watching television when he heard loud noises coming from Peters' apartment. He testified that it sounded like someone had dropped a couch or was moving. Cavanaugh testified that there was

---

[5] In her testimony, Dr. Scala-Barnett indicated that the injuries were not caused by a falling sweeper.

more than one "thump," more than ten in fact, and that the noises went on until 11 p.m. or midnight. He testified that he did not check to see what was happening and he simply turned his television up louder.

{¶31} Cavanaugh testified that he heard Peters' truck starting up some time after he heard the thumping noises. Cavanaugh testified that the only people with loud trucks at the Old Lincoln Inn at the time were Cavanaugh (himself) and Peters. Cavanaugh testified that he never heard Peters return. On cross-examination Cavanaugh admitted that he did not actually see Peters get into his truck, though he was familiar with the sound of it.

{¶32} Cavanaugh's wife Aubury also testified that she heard Peters leave in his truck around 12:30-1 a.m. Aubury testified that the sound of Peters' truck woke her up and that she checked her phone and looked for her husband because it sounded like his truck but her husband was home, so she assumed it was Peters in his truck, though she never saw Peters. Aubury testified that the next morning she was awakened by Valarie's screaming regarding her child. On cross-examination Aubury testified that Valarie looked like she was potentially acting.

{¶33} The State also presented the testimony of Allen Creed, who lived by the Old Lincoln Inn. He testified that when he left for work at approximately 2:15 a.m. on November 15, 2016, Peters' truck was not present at his apartment. Peters'

landlord also testified that when she woke up around 6:30 a.m., his truck was not at the apartment.

{¶34} In addition to the testimony about the night/early morning hours of the incident, the State presented the testimony of Eldon Howe-Anderson who had been incarcerated with Peters. Howe-Anderson testified that although Peters did not talk much about his case at first, he eventually said some things. Howe-Anderson testified that Peters had told him three different, inconsistent times that he had left the residence in the early morning hours of November 15, 2016: 1 a.m., 7 a.m., and 8 a.m. Howe-Anderson also testified that while watching crime dramas with Peters there were occasions when Peters would ask questions about what forensic evidence could show, such as finding old fractures. Howe-Anderson testified that at one point Peters said to him that he was just going to go into court and ask for the death penalty because he could not stand to live with what he had done.

{¶35} In his case-in-chief, Peters called Deb Booth of the Putnam County Job and Family Services, Children Services Unit. Booth testified to issues with Valarie's parenting and a case regarding her and H.R. Booth testified that at one point Valarie had said she would rather have a dog than a child.

{¶36} Booth testified that she had trouble getting into contact with Valarie to check H.R.'s environment when she was working the case. Booth testified that during one visit on August 24, 2016, she knocked repeatedly at the Old Lincoln Inn

until a man appeared saying that Valarie and H.R. were not present, even though Booth could hear a child "fussing." Booth testified that Valarie later told her that the man was Peters. Booth asked to see the child, but permission was not given. Booth indicated that the male very quickly showed her the child and shut the door on her. Booth testified that she called the police but was unable to do anything more at the time.

{¶37} As his final witness, Peters called Dr. Werner Spitz who testified that while there was certainly significant physical abuse of the child, it was his belief that H.R. died of a toxic level of Benadryl. Dr. Spitz testified that he thought that the blood sample taken from H.R. might have been diluted, and that the level of Benadryl in his system may have actually been much higher than it was found to be by the toxicologist.[6] Dr. Spitz admitted that he did not personally examine the child and that he was being paid for his testimony.

Argument and Analysis

{¶38} On appeal, Peters argues that his convictions were against the manifest weight of the evidence. He argues that Valarie Dean was more likely to have caused H.R.'s death than Peters. In support, Peters argues that the evidence indicated that Valarie was alone with H.R. prior to his death, that she had indicated H.R. was fine

---

[6] The coroner and the toxicologist adamantly disputed the claim that the sample was diluted. They indicated that a diluted sample would be visibly diluted, and this sample was not visibly diluted.

when she had returned home from work, and that Valarie had once said she would rather have a dog than a child.

**{¶39}** Notwithstanding this point, Peters also contends that no one actually saw him leave the Old Lincoln Inn and no one witnessed him harming H.R. Further, Peters argues that there was no blood found at the scene and no marks on the walls indicating that something had been thrown against them. Peters maintains that, at best, the evidence against him was circumstantial, and it did not amount to proof beyond a reasonable doubt.

**{¶40}** Contrary to Peters' arguments, the jury was presented with a significant amount of circumstantial evidence linking him to the crime. Circumstantial evidence is just as probative or persuasive as direct evidence. *State v. Healey*, 6th Dist. Lucas No. L-14-1213, 2015-Ohio-4630, ¶ 11.

**{¶41}** It was established that Peters was left alone with H.R. while Valarie went to work. Peters' neighbor heard loud noises from his apartment prior to midnight, loud enough that he thought a couch was being moved and dropped. Then, both of Peters' neighbors heard a person in a loud truck leave just after midnight. They associated the loud truck with Peters. Peters' truck was not present at the apartment when another witness went to work at 2:15 a.m., and it was not present when the landlord awakened at 6:30 a.m. Peters told another incarcerated individual inconsistent times that he left his residence during the early morning

hours of the incident: 1 a.m., 7 a.m., and 8 a.m. The vast majority of these times all conflict with Peters' statement in his interrogation wherein he indicated he left approximately 20 minutes before Valarie returned home from work, and that he had not left at all during the night/early morning hours.

{¶42} When Valarie returned home she indicated that she looked in on H.R. but that she did not pick him up or further check on him and that she went to bed. After she awakened she found H.R. cold and not breathing so she called 9-1-1. The autopsy revealed a number of brutal internal injuries to H.R., which were described to the jury. The injuries included marks that looked specifically like two fists had struck H.R. in the side. One such mark was an abrasion, possibly from a ring, and Peters later inquiring during his interview about one of his rings that had been taken. Further, the coroner determined that H.R. had likely died 12 to 18 hours before being discovered, which was well within the timeframe Peters was alone with H.R., and 12 hours would be approximately the time that the neighbors were hearing noises from Peters' apartment.

{¶43} Although Peters' expert opined that H.R. had actually died of a Benadryl overdose, he actually admitted that H.R. was a badly abused child. The State's experts affirmatively discounted the testimony of Peters' expert regarding the Benadryl being the cause of death, and the jury was certainly free to believe the conclusions of the State's witnesses that H.R. had been beaten to death and that

while he had a toxic level of Benadryl in his system, it was not a "lethal" level. This is particularly true given that a Benadryl bottle found at the scene was nearly full.

{¶44} Moreover, while Peters did not give an actual confession, his statement to the other inmate that he could not live with what he had done was incriminating. In addition, although Peters did not testify, the jury was able to see his interview and evaluate his reactions to the questions asked by the detective in this matter. Finally, the jury could have found Peters' actions in fleeing after-the-fact as indicative of consciousness of guilt.

{¶45} Although it is true that no one actually saw Peters strike and kill H.R., the circumstantial evidence places Peters alone with the child during the suspected time of death. While Peters argues that Valarie was alone with H.R. once she returned home from work, that time frame does not fit with the time of death as testified to by the State's witnesses.

{¶46} "[A] defendant is not entitled to a reversal on manifest-weight grounds merely because inconsistent evidence was offered at trial." *State v. Bailey*, 10th Dist. Franklin No. 12AP-699, 2013-Ohio-3596, citing *In re C.S.*, 10th Dist. Franklin No. 11AP-667, 2012-Ohio-2988, ¶ 27. The jury is free to believe or disbelieve any or all of the testimony presented, and the trier of fact is in the best position to take into account inconsistencies in the evidence as well as the demeanor and manner of the witnesses to determine their credibility. *Id*. Although an appellate court must

sit as a "thirteenth juror" when considering a manifest weight argument, it must also give great deference to the jury. *Id.*

**{¶47}** Based on the evidence and the testimony presented we cannot find that Peters' convictions for Aggravated Murder, Felonious Assault, and Endangering Children were against the manifest weight of the evidence. Therefore, Peters' first assignment of error is overruled.

*Second Assignment of Error*

**{¶48}** In Peters' second assignment of error, he argues that the trial court erred by failing to merge his Aggravated Murder conviction and his Felonious Assault conviction for purposes of sentencing.[7]

Standard of Review

**{¶49}** Revised Code 2941.25, Ohio's multiple-count statute, governs allied offenses, and states as follows.

> **(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.**

> **(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.**

---

[7] Peters does not renew his argument that he made to the trial court that his convictions for Felonious Assault and Endangering Children should merge, or his argument that his convictions for Aggravated Murder and Endangering Children should merge.

{¶50} In *State v. Ruff,* 143 Ohio St.3d 114, 2015–Ohio–995, the Supreme Court of Ohio provided Ohio courts with the following guidelines as to how to interpret R.C. 2941.25.

> **As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when the defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation?** *An affirmative answer to any of the above will permit separate convictions.* **The conduct, the animus, and the import must all be considered.**

(Emphasis added.) *Ruff* at ¶ 31. The Supreme Court of Ohio further held in *Ruff* that "two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.* at ¶ 26.

{¶51} Whether offenses are allied offenses of similar import is a question of law that is reviewed *de novo. State v. Badertscher,* 3d Dist. Putnam No. 1214–06, 2015–Ohio–927, ¶ 21, citing *State v. Stall,* 3d Dist. Crawford No. 3–10–12, 2011–Ohio–5733, ¶ 15, citing *State v. Brown,* 3d Dist. Allen No. 1–10–31, 2011–Ohio–1461, ¶ 36.

Analysis

**{¶52}** Prior to sentencing in this case, the trial court requested that the parties file memoranda regarding potential merger issues. The State filed a memorandum citing the required *Ruff* analysis factors then summarily argued that the offenses in this case each caused separate identifiable harm and should not merge. More specifically, the State argued that, "[t]he violation of [C]hild [E]ndangering caused the abuse of the child in the failure to seek medical care after the injuries defendant inflicted, the prolongation of the suffering of the child, and the fractures of the child's ribs. The violation of [F]elonious [A]ssault caused the severe internal injuries and extreme suffering the defendant inflicted on the child. The violation of [A]ggravated [M]urder caused the death of the child victim." (Doc. No. 295).

**{¶53}** In response to the State's memorandum, Peters argued that the harm was actually the same from all of the allegations—the death of H.R. Peters argued that although there were potentially several separate injuries to H.R., the injuries were not tried as separate incidents of harm. Peters contended that, "The state may not attempt to garner a conviction on all three charges based on the same course of conduct, and then parse out individual injuries to support each charge merely for the purpose of sentencing." (Doc. No. 371).

**{¶54}** In reviewing the matter at the sentencing hearing, the trial court found that the Aggravated Murder was distinguishable from the other charges in this case

because it was of dissimilar import or significance from the Felonious Assault and Endangering Children convictions. The trial court also found that the Aggravated Murder was committed with a separate animus or motivation. The trial court then indicated that it did not need to consider the remaining *Ruff* question regarding whether the offenses were committed separately since it determined that the other two *Ruff* questions were answered in the affirmative.

{¶55} In reviewing the trial court's decision, we note that the trial court first determined that the Felonious Assault and the Aggravated Murder were of dissimilar import. The Supreme Court of Ohio stated in *Ruff* that offenses were of dissimilar import if there were separate victims or there was a separate, identifiable harm to each of the crimes. Here, H.R. was the only victim, thus the separate victim segment does not apply. The trial court must then have determined that the harm from the Aggravated Murder and the Felonious Assault was separate and identifiable.

{¶56} As to whether the harm in this case was separate and identifiable, the child in this case was only 15 months old. In our *de novo* review, the evidence showed a severe beating that consisted of *at least* multiple strikes and any single strike to a child of this age could constitute a Felonious Assault, particularly given the severity and multitude of internal injuries sustained here. There is also evidence

in the record (i.e. medical testimony) revealing that H.R. could have survived from the blows for up to an hour afterward.

{¶57} Moreover, the trial court also determined here that Peters' actions and inactions established a separate animus. We agree. Given the tender age of the child, an initial blow could cause serious physical harm, whereas multiple additional blows to different parts of the body would suggest a separate intent to kill, establishing a separate animus under *Ruff*. Based upon this, we cannot find that the trial court erred in finding that the Felonious Assault conviction does not merge with the Aggravated Murder conviction. Therefore, Peters' second assignment of error is overruled.

*Conclusion*

{¶58} For the foregoing reasons Peters' assignments of error are overruled and the judgment of the Van Wert County Common Pleas Court is affirmed.

*Judgment Affirmed*

**WILLAMOWSKI, P.J. and ZIMMERMAN, J., concur.**

**/jlr**